# IN THE UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF OHIO
# WESTERN DIVISION AT DAYTON

MAUREEN L. POEPPELMAN,   :

              Plaintiff,

Case No. 3:09-cv-428

District Judge Walter Herbert Rice
Magistrate Judge Michael R. Merz

   -vs-

MICHAEL J. ASTRUE,
COMMISSIONER OF
SOCIAL SECURITY,

              Defendant.   :

## REPORT AND RECOMMENDATIONS

Plaintiff brought this action pursuant to 42 U.S.C. §405(g) and 42 U.S.C. §1381(c)(3) as it incorporates §405(g), for judicial review of the final decision of Defendant Commissioner of Social Security (the "Commissioner") denying Plaintiff's application for Social Security benefits. The case is now before the Court for decision after briefing by the parties directed to the record as a whole.

Judicial review of the Commissioner's decision is limited in scope by the statute which permits judicial review, 42 U.S.C. §405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings must be affirmed if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *citing, Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Landsaw v.*

*Secretary of Health and Human Services*, 803 F.2d 211, 213 (6th Cir. 1986).  Substantial evidence is more than a mere scintilla, but only so much as would be required to prevent a directed verdict (now judgment as a matter of law), against the Commissioner if this case were being tried to a jury. *Foster v. Bowen*, 853 F.2d 483, 486 (6th Cir. 1988); *NLRB v. Columbian Enameling & Stamping Co.*, 306 U.S. 292, 300 (1939).

In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole.  *Hepner v. Mathews*, 574 F.2d 359 (6th Cir. 1978); *Houston v. Secretary of Health and Human Services*, 736 F.2d 365  (6th Cir. 1984); *Garner v. Heckler*, 745 F.2d 383 (6th Cir. 1984).  However, the Court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.  *Garner, supra.*  If the Commissioner's decision is supported by substantial evidence, it must be affirmed even if the Court as a trier of fact would have arrived at a different conclusion.  *Elkins v. Secretary of Health and Human Services*, 658 F.2d  437, 439 (6th Cir. 1981).

To qualify for disability insurance benefits (SSD), a claimant must meet certain insured status requirements, be under age sixty-five, file an application for such benefits, and be under a disability as defined in the Social Security Act, 42 U.S.C. § 423. To establish disability, a claimant must prove that he or she suffers from a medically determinable physical or mental impairment that can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §423(d)(1)(A). Secondly, these impairments must render the claimant unable to engage in the claimant's previous work or in any other substantial gainful employment which exists in the national economy. 42 U.S.C. §423(d)(2).

To qualify for supplemental security benefits (SSI), a claimant must file an

2

application and be an "eligible individual" as defined in the Social Security Act. 42 U.S.C. §1381a. With respect to the present case, eligibility is dependent upon disability, income, and other financial resources. 42 U.S.C. §1382(a). To establish disability, a claimant must show that the claimant is suffering from a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §1382c(a)(A). A claimant must also show that the impairment precludes performance of the claimant's former job or any other substantial gainful work which exists in the national economy in significant numbers. 42 U.S.C. §1382c(a)(3)(B). Regardless of the actual or alleged onset of disability, an SSI claimant is not entitled to SSI benefits prior to the date that the claimant files an SSI application. *See,* 20 C.F.R. §416.335.

The Commissioner has established a sequential evaluation process for disability determinations. 20 C.F.R. §404.1520. First, if the claimant is currently engaged in substantial gainful activity, the claimant is found not disabled. Second, if the claimant is not presently engaged in substantial gainful activity, the Commissioner determines if the claimant has a severe impairment or impairments; if not, the claimant is found not disabled. Third, if the claimant has a severe impairment, it is compared with the Listing of Impairments, 20 C.F.R. Subpart P, Appendix 1 (1990). If the impairment is listed or is medically equivalent to a listed impairment, the claimant is found disabled and benefits are awarded. 20 C.F.R. §404.1520(d). Fourth, if the claimant's impairments do not meet or equal a listed impairment, the Commissioner determines if the impairments prevent the claimant from returning to his regular previous employment; if not, the claimant is found not disabled. Fifth, if the claimant is unable to return to his regular previous employment, he has established a *prima facie* case of disability and the burden of proof shifts to the

Commissioner to show that there is work which exists in significant numbers in the national economy which the claimant can perform. *Bowen v. Yuckert,* 482 U.S. 137, 145, n.5 (1987).

Over time, Plaintiff has filed several applications for SSD and SSI. The present case pertains to her July 15, 2003, application for SSD and September 15, 2005, application for SSI. *See,* Tr. 17. On her July 15, 2003, application, Plaintiff alleged disability from March 25, 2001, and on her September 25, 2005, application, Plaintiff alleged disability from March 25, 2004, [sic][1] due to memory loss, major depressive disorder, inability to cope with stress, severe osteopenia to osteoarthritis, fibromyalgia, and chronic back and neck pain. *See,* Tr. 72-74; 98. Plaintiff's applications were denied initially and on reconsideration. *See,* Tr. 52-55; 58-60. Administrative Law Judge Melvin Padilla held a hearing, (Tr. 1031-81), and subsequently determined that Plaintiff is not disabled. (Tr. 14-45). Plaintiff sought review by the Appeals Council and in support of her request, she submitted over three hundred pages of additional evidence.[2] (Tr. 706-1032). The Appeals Council denied Plaintiff's request for review, (Tr. 6-12), and Judge Padilla's decision became the Commissioner's final decision.

In determining that Plaintiff is not disabled, Judge Padilla found that she met the insured status requirements of the Act through September 20, 2008. (Tr. 21, ¶ 1). Judge Padilla also found that Plaintiff has severe affective disorder with features of depression and anxiety and possible somatoform disorder versus malingering, but that she does not have an impairment or combination

---

[1] The Commissioner has presumed that the March 24, 2004, date was an error and considers March 25, 2001, the disability onset date. *See,* Tr. 17.

[2] This additional evidence is not before the Court for purposes of substantial evidence review. *See, Bass v. McMahon,* 499 F.3d 506, 512-13 (6th Cir. 2007), *citing, Cline v. Commissioner of Social Security,* 96 F.3d 146, 148 (6th Cir. 1996) (citation omitted). However, the Court may occasionally refer to the evidence for the purpose of providing a more complete overview of Plaintiff's alleged impairments.

of impairments that meets or equals the Listings. *Id.*, ¶ 3; Tr. 34, ¶ 4. Judge Padilla found further that Plaintiff has the residual functional capacity to perform a limited range of sedentary work. (Tr. 34, ¶ 5). Judge Padilla then used sections 202.20 through 202.22 of the Grid as a framework for deciding, coupled with a vocational expert's (VE) testimony, and concluded that there is a significant number of jobs in the economy that Plaintiff is capable of performing. (Tr. 43, ¶ 10). Judge Padilla concluded that Plaintiff is not disabled and therefore not entitled to benefits under the Act. (Tr. 45).

In March, 2001, Plaintiff sustained a fracture to her right fifth toe while dancing. *See, e.g.,* Tr. 363-69. Plaintiff initially received treatment from two podiatrists. *See, e.g.,* Tr. 370-71, 388. Subsequently, Plaintiff received treatment from Dr. Laughlin at the Miami Valley Hospital Orthopedic Clinic. (Tr. 385-91). In May, 2001. Plaintiff's x-rays revealed "good fracture healing", and in June, 2001, she started physical therapy. *Id.* On June 12, 2001, Dr. Laughlin reported that Plaintiff's fracture had clinically healed. *Id.* Dr. Laughlin released Plaintiff from orthopedic care. *Id.*

Plaintiff consulted with Dr. Bertram on August 1, 2001, who noted that Plaintiff reported that she continued to experience constant pain in her right foot and that she was limited in walking to about one-quarter mile. (Tr. 370-71). Dr. Bertram also noted that Plaintiff appeared anxious with pressured speech, her first MTP joint was mildly tender bilaterally, she exhibited eleven of eighteen fibromyalgia paired tender points, and that her upper trapezius muscles were quite tense. *Id.* Dr. Bertram identified Plaintiff's diagnoses as chronic bilateral foot pain worse on the right since right metatarsal fracture that was healed, perhaps an element of disuse hypersensitivity, possibly an element of sympathetic mediated pain, anxiety, and fibromyalgia. *Id.*

5

Examining psychologist Dr. Flexman reported on January 7, 2002, that Plaintiff had a high school education, was currently working eighteen hours a week doing childcare for a family, was hospitalized in 1977 for treatment of depression related to a relationship and financial difficulties, and that she had seen a therapist in the past. (Tr. 232-37). Dr. Flexman also reported that Plaintiff's affect was dramatic with no lability, she was passive during the evaluation process, her verbal IQ was 89, her performance IQ was 75, and her full scale IQ was 80, placing her in the low average to borderline range of intellectual functioning. *Id.* Dr. Flexman noted that test results revealed that Plaintiff had some difficulty with immediate attention span, had an average ability to concentrate, functioned at the high school level for reading, spelling, and arithmetic, and that her pain inventory could not be analyzed because she indicated a significant amount of pain severity and pain interference in her life which was much more than was indicated during the clinical interview. *Id.* Dr. Flexman identified Plaintiff's diagnoses as undifferentiated somatoform disorder including pain disorder and passive-dependent personality disorder with hysteroid and passive-aggressive features, and he assigned her a GAF of 70. *Id.*

Plaintiff started receiving mental health treatment in February, 2002. (Tr. 713-52). At the time of Plaintiff's initial assessment, the counselor noted that Plaintiff had, at worst, mild symptoms and the counselor identified Plaintiff's diagnosis as depression. *Id.* The counselor assigned Plaintiff a GAF of 65. *Id.* These records reveal that Plaintiff saw the mental health counselor once a week through August 2002 and then about once a month from June 2003 through February 2004. *Id.*

Plaintiff's bone density scan performed on March 7, 2002, revealed severe osteopenia to osteoporosis in the lumbar spine and severe osteopenia in the left hip, but a normal left forearm.

6

(Tr. 238).

The record contains a copy of Plaintiff's treatment notes from her chiropractor dated April 24, 2002, through June 7, 2006. (Tr. 271-97; 409-20; 491-570; 645; 666-88). Those records reveal that Plaintiff received chiropractic care for fibromyalgia. *Id.* On August 22, 2003, Plaintiff's chiropractor reported that Plaintiff had chronic pain, swelling, soreness, and stiffness throughout the musculoskeletal frame and extremities which was aggravated by excessive physical activities, weather changes, and emotional stress, and that she had difficulty with prolonged periods of walking, standing, lifting, carrying, bending, and climbing steps. *Id.* Plaintiff's chiropractor also reported that Plaintiff's condition affected her ability to concentrate and lent itself to periods of depression. *Id.* In February 2007 Plaintiff's chiropractor reported that Plaintiff's diagnosis was severe fibromyalgia with concurrent musculoskeletal components including vertebral and extremity segmental dysfunction, osteoarthritis, plantar fascitis, chondromalacia patellae, carpal tunnel syndrome, seasonal affective disorder, TMJ dysfunctional complex, and cluster headaches and that her status was poor but stable. *Id.* Plaintiff's chiropractor also reported that Plaintiff was able to stand/walk and sit each for less than one hour in an eight-hour workday and for one-half hour without interruption, lift up to five pounds occasionally, and that she was very limited in her physical capacities. *Id.* Plaintiff's chiropractor opined that Plaintiff was unemployable. *Id.*

Plaintiff was hospitalized in June 2003 for treatment of depression and anxiety with suicidal ideation. (Tr. 251-70). At the time Plaintiff was admitted, it was noted that she had a longstanding history of anxiety and depression and that there were three major stressors that had made her anxiety worse, specifically, the end of her seventeen-year intimate relationship in July 2002 with a man who was married to another woman and with whom he had been living throughout,

the end of another relationship in November, 2002, with a friend with whom she had been close for the past five years and who recently revealed he was bisexual, and a move to a new residence in March 2003. *Id.* It was noted that Plaintiff's mood was low, depressed, and anxious, her affect was tense, and that her thought content and process and speech were normal. *Id.* Plaintiff was treated with medication and therapy and discharged with the diagnoses of generalized anxiety disorder, major depressive disorder, rule out prolonged duress stress disorder, rule out adjustment disorder, and dependent personality traits; she was assigned a GAF of 45-55. *Id.*

The record contains Plaintiff's treatment notes from Eastway Behavioral Healthcare dated June 9, 2003, through June 10, 2004, (Tr. 318-47) and October 11, 2005, through January 3, 2006. (Tr. 574-641). Those records reveal that Plaintiff received treatment at that facility for major depressive disorder, recurrent and mild, rule out dysthymic disorder, anxiety disorder, NOS, rule out PTSD, and borderline independent personality traits. *Id.* Over time, Plaintiff's mental health care providers assigned Plaintiff a GAF of from 45 to 50. *Id.* When Plaintiff was discharged from care at Eastway on June 10, 2004, it was noted that Plaintiff had not received any services since February 5, 2004, had irregular treatment, had received minimal benefit from treatment, reported that she felt emotionally better, and that she was referred back to a counselor for therapy-only treatment. *Id.*

When Plaintiff re-instituted treatment at Eastway in October, 2005, it was noted that Plaintiff reported flash-backs related to her childhood, that she was hostile, withdrawn, anxious, and agitated, and that her thought content was normal and her thought process concrete. *Id.* It was also noted that Plaintiff's mood was depressed, anxious, angry, and irritable, her affect was constricted and labile, and that she was cooperative. *Id.* Plaintiff's diagnoses were identified as major depressive disorder, recurrent and moderate, rule out dysthymic disorder, anxiety disorder NOS, rule

8

out PTSD, and dependent personality traits and she was assigned a GAF of 45-40. *Id.*

Dr. Schriber reported in September, 2003, that he last saw Plaintiff in 1986, and that he was "unable to establish a specific diagnosis other than fibromyalgia syndrome, functional rheumatism, anxiety, and depression" which were not "considered to be permanently disabling and that at that time she did not meet any of the musculoskeletal criteria for disability." (Tr. 299).

Treating physician Dr. Nanda reported that he last saw Plaintiff on July 30, 2003, her diagnoses were major depression, generalized anxiety disorder, and fibromyalgia, and her status was improving with treatment, and that Plaintiff was receiving mental health treatment at Eastway. (Tr. 314-15). Dr. Nanda also reported that Plaintiff was able to stand/walk and sit each for four hours in an eight-hour workday and for thirty minutes without interruption, lift up to twenty pounds occasionally and ten pounds frequently, and that his conclusions were not based on any objective medical evidence, but on Plaintiff's responses to questioning. *Id.*

In November, 2003, Dr. Flexman again examined Plaintiff and reported that she exhibited a gait disturbance, her facial expressions revealed anger, her speech was appropriate, she was irritable during the evaluation, and that she displayed overt pain behaviors although when she was observed walking to the parking lot, no impairments or problems were noted. (Tr. 301-04). Dr. Flexman also reported that Plaintiff was alert and oriented, her attention span was fair but her effort was poor, her concentration was good, she was functioning at the average level of intelligence, her memory was good, her judgment was fair, and that obsessive thinking concerning somatic or other psychological problems was judged to be out of proportion with reality and that somatization was present. *Id.* Dr. Flexman identified Plaintiff's diagnoses as undifferentiated somatoform disorder, major depression, recurrent, malingering, and dependent personality disorder and he assigned her

a GAF of 50. *Id.* Dr. Flexman opined that Plaintiff's abilities to understand, remember, and carry out short, simple instructions and to concentrate were slightly impaired and her abilities to make judgments for simple work-related decisions, to sustain attention, to interact with others, and to respond appropriately to work pressures in a normal work setting were moderately impaired. *Id.*

On December 1, 2003, Plaintiff's podiatrist advised Plaintiff that he did not think that he could adequately treat her condition as she had presented it over the last several months, that the conditions she described had included a suggestion of reflex sympathetic dystrophy syndrome, bunion deformity, and overall non-descript discomforts that seemed to become episodic and were frequently treated by chasing symptoms and that without the normal diagnostic indicators or treatment response that he expected, he did not feel he had sufficient options to treat her condition. (Tr. 240). Plaintiff's podiatrist opined that Plaintiff had a limited ability to stand or walk for more than a couple hours a day. (Tr. 242).

June 15, 2004, electrodiagnostic studies revealed mild to moderate carpal tunnel syndrome on the right with no evidence of polyneuropathy, radiculopathy, or myopathy. (Tr. 392-93). The studies also revealed normal right leg results. *Id.* In October, 2004, orthopedist Dr. Marcotte identified Plaintiff's diagnosis as mild to moderate carpal tunnel syndrome and opined that she would not benefit from surgery. (Tr. 449-50). When Plaintiff refused anti-inflammatory medication and a steroid injection, Dr. Marcotte recommended occupational therapy. *Id.*

A December 12, 2004, MRI of Plaintiff's right knee revealed mild interstitial tear of the ACL without evidence for a complete tear and Grade IV chondromalacia of the patella. (Tr. 397).

In January 2005 Dr. Marcotte reported that Plaintiff's right knee was "benign", that

there was slightly increased ligamentous laxity of the ACL compared to the opposite side, there was no atrophy, and that she had palpable pulses. (Tr. 438-39). Dr. Marcotte also reported that Plaintiff had a negative straight leg raise, full ranges of motion of her hip, knee, and ankle, that x-rays revealed age-appropriate degeneration without evidence of arthritis, and that her diagnosis was grade IV chondromalacia of the patella by MRI. *Id.*

Plaintiff participated in physical therapy during the period February through April, 2005, for treatment of her right knee pain. (Tr. 399-408). At the time Plaintiff completed therapy, it was noted that her gait and strength were normal. *Id.*

On May 4, 2005, Dr. Marcotte noted that Plaintiff reported she continued to have knee and ankle pain, that treatment from her chiropractor and a brace helped her condition, and that a massage therapist helped her back, shoulder, and foot conditions. (Tr. 433-34). Dr. Marcotte also reported that Plaintiff had tenderness at the ankle but had a good range of motion, was able to walk without an antalgic gait, and that she was neurovascularly intact. *Id.*

Plaintiff was orthopedist Dr. Mauro on August 17, 2005, who reported that Plaintiff had come primarily to get her disability papers filled out, that she had diffuse complaints, had a psychiatric history of numerous diagnoses and a rather complicated medical history. (Tr. 428). Dr. Mauro also reported that he stressed to Plaintiff the importance of follow-up care. *Id.*

Dr. Mauro and Dr. Schoen, Plaintiff's family practice physician reported in August 2005 that Plaintiff's diagnoses were somatization disorder, depression, fibromyalgia, osteopenia, mild carpal tunnel syndrome, chondromalacia of the patella, and osteoarthritis of the right knee and foot and that her status was poor but stable. *Id.* Those physicians also reported that Plaintiff was able to stand/walk for two hours in an eight-hour day and for ten minutes without interruption, sit

for four hours in an eight-hour day and for twenty minutes without interruption, and lift/carry up to five pounds. *Id.* The physicians opined that Plaintiff was unemployable. *Id.*

Dr. Mauro reported in November, 2005, that Plaintiff was using a right ankle brace, but that her ankle was intact with a little bit of swelling, that it was neurovascularly intact with functional range of motion, and that there was no pain on examination. (Tr. 425). Dr. Mauro also reported that Plaintiff was "doing fine" orthopedically and he ordered a walker that she requested. *Id.*

On November 21, 2005, Plaintiff's podiatrist reported that Plaintiff wanted a left ankle brace but that the etiology of her complaints was unclear because her physical exam was negative. (Tr. 474).

The record contains Plaintiff's treatment records from Advanced Therapeutic Services dated October 25, 2005, through June 13, 2006. (Tr. 650-65). Those records reveal that Plaintiff received mental health counseling at that facility for treatment of frustrations, adjustment problems, grief, coping with her history of abuse and molestation, and relationship issues. *Id.*

Plaintiff began receiving treatment from Dr. Snider who reported on January 8, 2007, that Plaintiff had multiple pain issues, undoubtedly had some myofascial pain syndrome as well as some fibromyalgia and TMJ issues, and that she had been treated unsuccessfully with multiple medical therapies. (Tr. 692). In February, 2007, Dr. Snider reported that Plaintiff's diagnoses were fibromyalgia, chronic anxiety/depression, carpal tunnel, osteoporosis, osteoarthritis, and TMJ, that her condition was poor but stable, and that her physical activity was limited secondary to pain and fatigue. (Tr. 696-98). Dr. Snider also reported that Plaintiff was able to stand/walk for one to two hours in an eight-hour workday and for one-half hour without interruption, sit for three hours in an

12

eight-hour workday and for one-half to one hour without interruption, and lift/carry up to 10 pounds occasionally and up to five pounds frequently. *Id.* Dr. Snider opined that Plaintiff was unemployable and based his opinion on "office visits". *Id.*

The Court notes that Plaintiff is *pro se* in this matter. A *pro se* litigant is entitled to liberal construction of his pleadings. *Haines v. Kerner*, 404 U.S. 519 (1972). Therefore, this Court will liberally construe Plaintiff's Statement of Errors as well as her Reply. (Doc. 10, 16).

In her [Statement of Errors], Plaintiff argues, *inter alia,* that the Commissioner erred by failing to find that she is disabled because she filed applications for SSD and SSI in November, 2009, and that based on those applications, the Commissioner determined that she became disabled as of April 21, 2004, and therefore entitled to benefits beginning November, 2008. *Id.*; PAGE ID#: 44. In response to Plaintiff's "subsequent application" argument, the Commissioner argues, *inter alia,* that Plaintiff failed to provide any documentation of the decision awarding her benefits. (Doc. 13, PAGEID #: 56). In support of her [Reply], Plaintiff has submitted copies of documents dated June, 2010, which she received from the Commissioner advising her that, indeed, based on her November 6, 2009, application she became disabled on April 21, 2004, and therefore entitled be benefits beginning November, 2008. (Doc. 16, PAGEID #: 205-24).

The remand provision of 42 U.S.C. §405(g) provides that the court may order a case remanded to the Commissioner for further consideration "only upon a showing that there is new evidence which is material and there is good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. §405(g); *see also, Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1233 (6th Cir. 1993).

The court may review new evidence submitted after the Administrative Law Judge's

decision for the limited purpose of determining the appropriateness of a remand to the Commissioner under sentence six of 42 U.S.C. §405(g). *Wyatt v. Secretary of Health and Human Services,* 974 F.2d 680, 685 (6th Cir. 1992). Such remand is appropriate, however, only if the court finds that the evidence is new and material and there is good cause for the failure to incorporate that evidence into the record of the prior proceeding. *Sizemore v. Secretary of Health and Human Services,* 865 F.2d 709, 711 (6th Cir. 1988).

To establish materiality, the plaintiff must show, "a reasonable probability that the Commissioner would have reached a different disposition of the disability claim if presented with the new evidence." *Sizemore,* 865 F.2d at 711 (citations omitted). New evidence on an issue already fully considered by the Commissioner is cumulative and is not sufficient to warrant remand of the matter. *Carroll v. Califano,* 619 F.2d 1157, 1162 (6th Cir. 1980). Additional evidence is material only if it concerns the plaintiff's condition prior to the Commissioner's decision. *Oliver v. Secretary of Health and Human Services,* 804 F.2d 964, 966 (6th Cir. 1986). Evidence of a subsequent deterioration or change in the plaintiff's condition after the administrative hearing is deemed immaterial. *Wyatt,* 974 F.2d at 685, *citing, Sizemore,* 865 F.2d at 712.

To show good cause, plaintiff must present some justification for the failure to have acquired and presented such evidence to the Commissioner for inclusion in the record during the hearing before the Administrative Law Judge. *See, Willis v. Secretary of Health and Human Services,* 727 F.2d 551 (6th Cir. 1984); *see also, Oliver, supra.* Additional evidence generated for the purpose of attempting to prove disability in contrast to evidence produced by continued medical treatment does not meet the good cause requirement of the Act. *Koulizos v. Secretary of Health and Human Services,* No. 85-1654 (6th Cir. Aug. 9, 1986) (table 802 F.2d 458).

A remand for the consideration of additional evidence is a "sixth sentence" remand, *see, Sullivan v. Finkelstein,* 496 U.S. 617 (1990), and is a pre-judgment remand. *Faucher v. Secretary of Health and Human Services,* 17 F.3d 171, 175 (6th Cir. 1994) (citations omitted). Following such a remand, the Commissioner shall, after the case is remanded and after hearing such additional evidence if so ordered, modify or affirm the findings of fact or decision, or both, and shall file with the court any such additional and modified findings of fact and decision. *Finkelstein, supra.* Stated differently, in the case of a "sixth sentence" remand, the district court retains jurisdiction so that following this type of remand, it may review such additional or modified findings.

Generally, the fact that the Commissioner concluded, based on a subsequent application, that Plaintiff is disabled, does not necessarily lead to the conclusion that his decision to not award benefits on a prior application is not supported by substantial evidence. However, the additional evidence which Plaintiff submitted to this Court raises a question as to whether the Commissioner relied on the same evidence in granting Plaintiff's subsequent application that he relied upon in denying Plaintiff's applications at issue. Specifically, Plaintiff filed the applications at issue in July 2003 and September 2005 alleging disability from March, 2001. In the decision dated April 18, 2007, the Commissioner determined that Plaintiff is not disabled. However, based on Plaintiff's November, 2008, applications, the Commissioner determined that Plaintiff became disabled as of April 21, 2004. The Commissioner's subsequent finding of disability overlaps the time periods involved in Plaintiff's presently-at-issue applications. It simply is not clear whether the Commissioner relied on the same evidence in determining that Plaintiff became disabled as of April 21, 2004, that Plaintiff had submitted in support of her July 2003 and September 2005

applications. Because the Commissioner may reevaluate his findings with respect to Plaintiff's July 2003 and September 2005 applications, the evidence of the Commissioner's subsequent determination that Plaintiff is disabled is new and material.

There is good cause for Plaintiff's failure to have acquired and presented the evidence for inclusion in the record during the hearing before Judge Padilla. Judge Padilla held the hearing on July 6, 2006, and he issued his decision on April 18, 2007. (Tr. 1031-81; 14-45). The evidence at issue was not in existence until June 4, 2010. *See,* PAGEID # 205. The evidence was not generated for the purpose of attempting to prove disability in contrast to evidence produced by continued medical treatment nor was it generated to dispute any of the Commissioner's findings. Indeed, it is evidence which the Commissioner provided to Plaintiff.

This Court concludes that the additional evidence which Plaintiff submitted to this Court meets the remand standard of the Act.

It is therefore recommended that this matter be remanded for the purpose of considering the evidence which Plaintiff submitted to this Court. Because this is a Sixth Sentence remand, the Court should retain jurisdiction so that following remand, it may review any additional or modified findings.

December 8, 2010.

*s/ Michael R. Merz*
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed.R.Civ.P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen days after being served with this Report and Recommendations. Pursuant to Fed.R.Civ.P. 6(e), this period is automatically

extended to seventeen days because this Report is being served by one of the methods of service listed in Fed.R.Civ.P. 5(b)(2)(B), (C), or (D) and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum in support of the objections. If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See, United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).